UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LEISA MCWHORTER, ANITZA HARTSHORN,
PICHARD ALFORD, and LAKESHIER CLARK,
on behalf of the SCI 401(k) Plan, themselves,
and all others similarly situated,

      **Plaintiffs,**

v.                                  **CASE NO.:**

SCI SHARED RESOURCES, LLC, and
SERVICE CORPORATION INTERNATIONAL,

      **Defendants.**

_____/

## CLASS ACTION COMPLAINT

On behalf of the SCI 401(k) Retirement Savings Plan ("Plan"), Named Plaintiffs Leisa McWhorter, Anitza Hartshorn, Pichard Alford, and Lakeshier Clark ("Plaintiffs"), file this Class Action Complaint against Service Corporation International ("SCI Corp." or the "Company"), and the Plan's administrator, SCI Shared Services, LLC ("SCI Shared Services") (collectively "SCI" or "Defendants"), for breaching their fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against Defendants, the Plan's fiduciaries for breaches of their fiduciary duties.

2.    Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution

retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, '"participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.      The impact of excessive fees on employees' and retirees' retirement assets is

dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

7.      The Plaintiffs are each Plan participants.  As of December 31, 2020, the Plan had $1,296,650,113 in assets and 25,351 participants, qualifying it as a "mega plan" in the defined contribution 401(k) marketplace. Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

8.      Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

9.      For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

10.     For example, Defendants did not adhere to fiduciary best practices to control Plan fees and expenses. To the extent that Defendants made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendants employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation third-party service providers received from the plan for services provided were reasonable.

11.     Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendants' actions (and omissions) were contrary

to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

12. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

13. This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## THE PLAN

14. The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

15. The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

16. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

17. Eligible current and former employees of SCI are eligible participate in the Plan. The Plan provides the primary source of retirement income for many former SCI employees.

## THE PARTIES

### *Plaintiffs & Standing*

18. Plaintiff Lakeshier Clark is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

19. Plaintiff Pichard Alford is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

20. Plaintiff Leisa McWhorter is a participant in the Plan under 29 U.S.C. §1002(7)

because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

21.     Named Plaintiff Anitza Hartshorn is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

22.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches.

23.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

24.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

25.     To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.

26.     To establish standing, the Plaintiffs need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiffs allege such an injury for each claim.

27.     More specifically, the Plaintiffs have standing because the challenged conduct, including Defendants' actions resulting in Plaintiffs and the class members paying excessive

recordkeeping and administrative fees, affected all Plan participants in the same way.

28.     For example, the named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

29.     As a result of Defendants' actions, the Plaintiffs and class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

### *Defendants*

30.     Defendant Service Corporation International is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     Defendant SCI Shared Services, LLC, is a fiduciary to the Plan because it is the Plan administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Additional Information on the Plan*

32.     The Plan was established July 1, 2000.

33.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

34.     Schwab Retirement Plan Services, Inc. is currently the Plan's recordkeeper, and has been since July 1, 2014.[1]

35.     The Plan's assets are held by Charles Schwab Bank and participant accounts are maintained by Charles Schwab Bank.

36.     SCI employees can participate in the Plan after completing two months of employment.

37.     Plan participants may contribute a maximum of 50% of pretax annual compensation to their individual accounts in the Plan.

## **CLASS ACTION ALLEGATIONS**

38.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[2]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between July 5, 2019, and the present (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical. According to the 2020 Form 5500 filed with the U.S. Department of Labor, there were 25,351 Plan participants with account balances, as of December 31, 2020.

40.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries because of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other

---

[1] Prior to July 1, 2014, the Plan's assets were held by Massachusetts Mutual Life Insurance Company, and participant accounts were maintained by MassMutual Retirement Services.
[2] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Defendants failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of relief.

42.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES**

45.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

46.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

47.     As described above, Defendants were (and still are) a fiduciary of the Plan because they:

          A.     were so named; and/or

      B.      exercised authority or control respecting management or disposition of the Plan's assets; and/or

      C.      exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      D.      had discretionary authority or discretionary responsibility in the administration of the Plan.

48.      As fiduciaries, Defendants were/are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

49.      The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

50.      In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

51.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

52.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

53.    During the Class Period, Defendants did not act prudently or in the best interests of the Plan's participants because they caused Plan participants to pay excessive and unreasonable fees.

54.    During the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest fees for Participants. Defendants instead caused the Plan and its participants to pay excessive administration fees and excessive compensation to service providers.

55.    As set forth in detail below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are, therefore, liable for their breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

56.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

57.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[3]

58.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

59.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[4] Although at all times 401(k) accounts are fully funded, that does not prevent

---

[3] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 24, 2022).
[4] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited June 24, 2022).

plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

60.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

61.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[5] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

### Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses

62.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing,

---

[5] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited June 24, 2022).

preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

63.    Nearly all recordkeepers in the marketplace offer this range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

64.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

65.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

66.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

67.    Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiffs are not making a claim against Defendants merely because they used revenue sharing to pay recordkeeping fees.

68.     However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[6]

69.     Because revenue sharing payments are asset based, they bear no relation to actual services provided, and bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that the recordkeeper pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

70.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by

---

[6] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited June 24, 2022).

the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

71.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

72.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

73.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

74.     Here Defendants failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to the Plan's recordkeeper by failing to undertake any of the aforementioned steps.

75.     More specifically, Charles Schwab has been the Plan's recordkeeper during the entirety of the Class Period.

76.     Upon information and belief Defendants failed to undertake an RFP since 2015. If Defendants had undertaken an RFP to compare Charles Schwab's costs with those of others in the marketplace, Defendants would have recognized that Charles Schwab's compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

77.     Additionally, the Plan has nearly $1.3 billion of assets. This is Plan participant money. Defendants agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Charles Schwab clearing account.

Defendants agreed Charles Schwab could keep all of the interest earned on Plan participant accounts while participant money is in Charles Schwab's clearing account. This is a form of indirect compensation that Charles Schwab receives as the recordkeeper for the Plan. However, Defendants have not tracked, monitored, or negotiated the amount of compensation Charles Schwab receives from income it earns on Participant money. Defendants breached their fiduciary duty of prudence by allowing Charles Schwab to receive compensation from Plan participants without even knowing the amount of compensation Charles Schwab collects from interest on participant money.

78.    Charles Schwab also receives "direct compensation" from Plan participants. From 2015 to 2020 the direct compensation that Charles Schwab received from Plan participants, per participant, as disclosed on the Plan's 5500 disclosures filed with the Department of Labor were as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2015 | $56.07 |
| 2016 | $55.23 |
| 2017 | $55.70 |
| 2018 | $55.49 |
| 2019 | $53.21 |
| 2020 | $50.63 |

79.    The direct compensation that Charles Schwab received was – on a stand-alone basis – excessive for recordkeeping. Plans of similar size pay no more than $25 per year per participant for recordkeeping fees. Here, the direct compensation alone was more than double what a reasonable fee should have been.

80.     Moreover, as noted above, Charles Schwab did not receive only the direct compensation in addition to the float interest compensation on Plan participant's money discussed above above—it received even more compensation for recordkeeping services through revenue sharing payments. Such revenue sharing payments are particularly problematic because they are asset-based, and they usually bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially in billion dollar plans like the one here.

81.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

82.     The best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

83.     The 2020 Form 5500 filed with the U.S. Department of Labor reveals Charles Schwab received (and continues to receive) a massive amount of additional "indirect" compensation via recordkeeping. Specifically, the 2020 5500 discloses the following indirect compensation paid to Charles Schwab:

| Received By Charles Schwab & Co., Inc. (EIN: 94-1737782) | | |
| Fund Family/Provider | EIN | Formula |
| --- | --- | --- |
| Allianz Funds | 06-1349805 | Rate of 0.02% of average daily balance of asset(s) |
| American Beacon | 75-2401150 | Rate of 0.40% of average daily balance of asset(s) |
| American Century Investments | 43-0821857 | Rate of 0.35% of average daily balance of asset(s) |
| American Funds | 90-0924512 | Range of 0.35 - 0.37% of average daily balance of assets |
| Brown Advisory Funds | 52-1952888 | Rate of 0.40% of average daily balance of asset(s) |
| DF Dent Funds | Not Available | Rate of 0.40% of average daily balance of asset(s) |
| DoubleLine | Not Available | Rate of 0.15% of average daily balance of asset(s) |
| Franklin Templeton Investments | 94-3167260 | Range of 0.15 - 0.40% of average daily balance of assets |
| Guggenheim Investments | Not Available | Rate of 0.10% of average daily balance of asset(s) |
| Invesco | 58-2287224 | Rate of 0.50% of average daily balance of asset(s) |
| Laudus Funds | 94-3106735 | Rate of 0.10% of average daily balance of asset(s) |
| Lazard | Not Available | Rate of 0.10% of average daily balance of asset(s) |
| Matthews Asia Funds | 94-3250972 | Rate of 0.33% of average daily balance of asset(s) |
| Natixis Funds | 52-2257782 | Rate of 0.07% of average daily balance of asset(s) |
| Northern Funds | 36-3608252 | Rate of 0.05% of average daily balance of asset(s) |
| Oakmark | 52-2257782 | Rate of 0.35% of average daily balance of asset(s) |
| PGIM Funds (Prudential) | Not Available | Range of 0.10 - 0.25% of average daily balance of assets |
| Pioneer Investments | 13-5657669 | Rate of 0.35% of average daily balance of asset(s) |
| PT Asset Management | Not Available | Rate of 0.40% of average daily balance of asset(s) |
| Schwab Funds | 94-3106735 | Range of 0.13 - 0.25% of average daily balance of assets |
| Wasatch | 87-0319391 | Rate of 0.40% of average daily balance of asset(s) |

84.    In 2020 the Plan had more than $76 million in Northern Trust's S&P 500 fund. Accordingly, Charles Schwab pocketed roughly $38,000 in additional "indirect" fees simply because of investments through the Plan in this particular fund. This example is illustrative and not exhaustive. The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $150 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

85.    The recordkeeping fees paid to Charles Schwab are far greater than recognized reasonable rates for a plan with more than $1 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Charles Schwab. Charles Schwab performs task for the Plan such as validating payroll data,

tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.)

86.      The services that Charles Schwab provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.   Defendants' failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

87.      Looking at recordkeeping costs for other plans of a similar size as of 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.   The chart[7] below analyzes a few well managed plans having tens of thousands of participants with billions of dollars in assets under management, like the Plan:

| Name of Plan | Total Number of Participants | Dollar Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Service Costs on a Per-Participant Basis[8] |
|---|---|---|---|---|
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 |
| Kaiser Permanente Supplemental | 46,943 | $3,793,834,091 | $1,526,401 | $33 |

[7] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[8] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

| | | | | |
|---|---|---|---|---|
| Savings and Retirement Plan | | | | |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 |

88.     Thus, if the Plan were a standalone plan, with over 20,000 participants and over $1,296,650,113 dollars in assets in 2020, Defendants should have been able to negotiate a recordkeeping cost anywhere from $20 per participant to $25 from the beginning of the Class Period to the present.

89.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendants could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Defendants failed to do so and, as a result, violated their fiduciary duties under ERISA.

## FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

90.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

91.     As a fiduciary of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

92.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

93.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

94.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1.    Find and declare that the Defendants have breached their fiduciary duties as described above;

2.    Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

9.      Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 7th day of July 2022.

Respectfully submitted,


*/s/ Christopher R. Miltenberger*
**BRANDON J. HILL** (pro hac vice forthcoming)
Florida Bar Number: 37061
**LUIS A. CABASSA** (pro hac vice forthcoming)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (pro hac vice forthcoming)
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602

- 24 -

Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY** (pro hac vice forthcoming)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law


**CHRIS R. MILTENBERGER**
Texas Bar No. 14171200
**THE LAW OFFICE OF CHRIS R. MILTENBERGER, PLLC**
1360 N. White Chapel, Suite 200
Southlake, Texas 76092
817-416-5060 (office)
817-416-5062 (fax)
Email: chris@crmlawpractice.com